## In re DR. VOORHEES AWNING HOOD CO.

### (District Court, M. D. Pennsylvania. January 26, 1911.)

### No. 1,118.

1. **PATENTS (§ 218\*)—AGREEMENT TO PAY ROYALTIES—TERMINATION BY MUTUAL CONSENT.**

   A corporation organized to manufacture a patented awning under a license contracted to pay the patentee a bonus of 1 per cent. a foot for all awnings sold, with a guaranty of a minimum number of 10,000 the first year and an additional 10,000 each succeeding year. *Held* that, where the contract was terminated by agreement during a year, the patentee was entitled to recover as bonus for that year 1 per cent. per foot on the awnings that had been actually sold up to the time of the termination only, the provision for a minimum number being applicable only in case that number had not been sold at the end of the year.

   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 218.\*]

2. **BANKRUPTCY (§ 314\*)—PROVABLE CLAIMS—SALARY ACCRUING AFTER BANKRUPTCY OF CORPORATION.**

   An officer of a corporation is not entitled to prove a claim for salary accruing after the bankruptcy of the corporation.

   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.\*]

3. **BANKRUPTCY (§ 318\*)—PROVABLE CLAIMS—LICENSE CONTRACT UNDER PATENT.**

   Where a corporation which as part consideration for an exclusive license to manufacture under a patent had contracted to pay to the patentee a bonus or royalty on the patented articles sold, with a guaranty of a minimum number during the year, became bankrupt before the end of the year, the patentee was entitled to prove a claim for the amount of royalty which had accrued up to the time of the bankruptcy at the minimum rate, irrespective of the number of articles actually sold.

   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 318.\*]

4. **BANKRUPTCY (§ 318\*)—PROVABLE CLAIMS—LICENSE CONTRACT UNDER PATENT.**

   The bankruptcy of a corporation which held an exclusive manufacturing license under a patent, to continue for its life, under a contract which required it to pay royalties on a minimum number of the patented articles each year, operated as an enforced termination of the contract, and the patentee cannot prove a claim for future royalties accruing during the remainder of the term; but he is entitled to prove a claim for damages for the breach of the contract, to be estimated in view of the fact that, having fallen in, he is at liberty to again dispose of it.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 481, 482; Dec. Dig. § 318.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. CORPORATIONS (§ 308*)—OFFICERS—CLAIMS AGAINST CORPORATION.

In the absence of an express contract to that effect, the president of a corporation is not entitled to a commission on stock or property of the corporation sold by him.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334-1339; Dec. Dig. § 308.*]

6. BANKRUPTCY (§ 316*)—PROVABLE CLAIMS—INDORSER FOR BANKRUPT.

An indorser for a bankrupt corporation cannot prove a claim in his own name on account of his indorsement unless he has paid the company's obligation.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 316.*]

7. BANKRUPTCY (§ 314*)—CLAIMS AGAINST CORPORATION—OFFICERS.

The president of a corporation who, to comply with a requirement of its charter that it maintain an office in a city, but without action by the directors, furnished room in his own office, cannot prove a claim for the rental thereof against the estate of the corporation in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

In the matter of Dr. Voorhees Awning Hood Company, bankrupt. On certificate from W. L. Hill, referee, sur claim of Dr. S. H. Voorhees. Claim allowed in part.

Decree reversed 188 Fed. 425.

The following is the essential part of the referee's report:

Dr. Samuel Herbert Voorhees has filed various affidavits of claim, to which the trustee has filed exceptions. No one of the affidavits is a complete proof of a claim as required by the bankruptcy law, nor do all of the affidavits taken together constitute such proof, and in the taking of testimony it was understood that the burden of proof was on the plaintiff (Test. p. 245), and that all of the evidence should be considered in passing upon the claim, which is made up of several items stated in the affidavits finally, after some amendments, as follows:

### The Claim.

0. Stock (common) due on commissions not issued, shares 1,705.

| | |
|---|---:|
| 1. Cash commissions on stock sales, balance estimated........ $ | 62 00 |
| 2. Incidental expenses, President's office..................... | 23 80 |
| 3. Bonus license contract from December 9, 1905 to April 12, 1907 ................................................ | 67 00 |
| 4. 1% business (estimated) to April 12, 1907.................. | 33 00 |
| 5. President's salary from April 12, 1907 to April 29, 1908..... | 744 00 |
| 6. President's salary from April 1, 1907 to April 12, 1907...... | 24 00 |
| 7. License royalty, first year............................... | 100 00 |
| 8. Royalty on parts....................................... | 1 00 |
| 9. Commission on sale of merchandise to April 29, 1908 (estimated) ................................................ | 92 00 |
| 10. Bill against the receiver (too long to insert here).......... Receiver's violation of manufacturing and selling license contract. Minimum royalties in full.................... | 14,647 84 |
| 11. Maintaining office of record, Coal Exchange Building, May 1, 1907 to and including Oct., 1908, at $5.00 per month.... | 90 00 |
| 12. Surcharged check, Lindabury transaction.................. | 10 00 |
| 13. A protection note, for personally guaranteeing payment on goods bought from John Boyle & Co., N. Y., and Hoffman, Korr & Co., Phila., Pa. Said note being given by the bankrupt in March, 1907 (in conjunction with two others)..... | 2,000 00 |
| 14. Protection note for indorsing the back of bankrupt's commercial note, given in May, 1907 (in conjunction with nine others) ................................................ | 5,000 60 |

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

### Findings of Fact.

1. On the 8th day of November, 1905, in the county of Lackawanna, Pa., Samuel Herbert Voorhees, M. D., claimant in this case, and William Henry Shrader, signed and acknowledged articles of incorporation of the Dr. Voorhees Awning Hood Company, the bankrupt in this case, and these articles were afterwards executed by Philip Lawrence in Beadle county, S. D., and on the 21st day of November, 1905, were filed in the office of the Secretary of State of South Dakota.

\* \* \* \* \* \* \* \* \* \*

8. On the 9th day of December, 1905, without any action on behalf of the company other than that set forth in the minutes of the meeting of November 28th, a paper called "manufacturing and selling license" was executed by Dr. Voorhees for himself on the one part, and Dr. Voorhees and Mr. Shrader for the Dr. Voorhees Awning Hood Company on the other part, which instrument was as follows:

### "Manufacturing and Selling License.

"This agreement made this 9th day of December, 1905, between Samuel Herbert Voorhees, M. D., party of the first part, and the Dr. Voorhees Awning Hood Company, Incorporated, the party of the second part, witnesseth, that whereas letters patent of the United States of America for ventilated awnings were granted to the party of the first part, dated September 5th, 1905, No. 798,756, and whereas the party of the second part is desirous of manufacturing and selling the awnings and devices so described and claimed in said patent; now, therefore, the parties have agreed to as follows:

"First. The party of the first part hereby licenses and empowers the party of the second part with the exclusive right to manufacture and sell said awnings and hoods within the limits of said United States only subject to the conditions hereinafter named, on the above said patent and others now pending, or any other rights that may at any future time be granted to the party of the first part in the said United States (including copyrights, trademarks, distinctive signs, etc.), that relate to awnings and awning hoods, to the natural end of the terms of said letters, copyrights, etc., are granted.

"Second. That the party of the second part agrees to give in payment for the same to the party of the second part, fifty-one (51%) per cent. of the capital stock of the said company; making him the general manager of the company at a salary of one (1%) per cent. of the gross earnings of the company (said salary being figured in the cost of selling the productions of the said company); and a bonus of one (1¢) cent a running foot on all its sheet metal work, and one (⅛¢) eighth of a cent on all metal parts and fixtures relating thereto; to render to the party of the first part a correct statement and payment for the same at the end of each month; that the minimum of the said bonuses shall be 10,000 ft. of the sheet metal (running) for the first year and for each succeeding year it shall increase at least 10,000 ft. over and above that of its preceding year. Said bonuses payable only for the natural life of the said patents.

"Though not waiving any rights in case of liquidation or dissolution, the party of the first part agrees to allow the party of the second part to pay to the holders of the outstanding preferred stock of the company, its dividends prior to the settlements of said bonuses at such times as it may be deemed necessary so to do by the party of the second part.

"That in witness whereof the parties of the above named (The Dr. Voorhees Awning Hood Company, Incorporated, by its president and secretary) have hereunto set their hands and seals the day, month and year above written.      [Seal.]    Samuel Herbert Voorhees, 1st party.

"The Dr. Voorhees Awning Hood Co., 2nd party.
      "Per Samuel Herbert Voorhees, President.
      "Per Wm. H. Shrader, Secretary."

• • • • \* \* \* \* \* \* \*

15. At a meeting of the board of directors held on the 12th day of April, 1907, the following actions were taken (Minute Book page 2):

"Motion by Hackett, seconded by Helmer, that the president and secretary be authorized to execute and sign a new license agreement between S. H.

Voorhees and this company, to take the 'place of the old contract, which is hereby annulled, approved.

"The resignation of S. H. Voorhees as general manager is then tendered to take effect this 12th day of April, 1907.

"Motion by Evans, seconded by C. B. Hollister, that the resignation of S. H. Voorhees as general manager be and hereby is accepted to take effect to-day, approved."

16. On the 12th day of April, 1907, Dr. Voorhees, for himself on the one part, and Dr. Voorhees as President and W. H. Shrader as Secretary, for the Dr. Voorhees Awning Hood Company on the other part, executed an instrument as follows:

### "Manufacturing and Selling License.

"This agreement was made this 12th day of April, 1907, between Samuel Herbert Voorhees, M. D., party of the first part, and the Dr. Voorhees Awning Hood Company, Incorporated, party of the second part, witnesseth, that whereas letters patent of the United States of America for ventilated awnings were granted to the parties of the first part, dated September 5th, 1905, No. 795,756, and whereas the party of the second part is desirous of manufacturing and selling awnings and devices so described and claimed in said patent; now, therefore, the parties have agreed as follows:

"First. The party of the first part hereby licenses and empowers the party of the second part with the exclusive right to manufacture and sell said awnings and hoods within the limits of said United States only, subject to the conditions hereinafter named, on the above-named patent and others pending, or any other rights that may at any other time be granted to the party of the first part in the said United States (including copyrights, trade-marks, distinctive signs, etc.), that relate to awnings and awning hoods, to the natural end of the term of the said letters, copyrights, etc., heretofore and hereafter granted.

"Second. The party of the second part agrees to give to the party of the first part in payment for the same fifty-one per cent. (51%) of the capital stock of said company; make him the president of said company at a salary of one per cent. (1%) on the gross sales of hoods and parts, and if such percentage shall not amount to the sum of seven hundred and twenty ($720.00) dollars per annum then the difference shall be paid to said first party·out of the gross earnings of the company, and in addition thereto a bonus of one cent per running foot on all hoods complete and ready for erection, and sold, and also one-eighth of one cent on all additional or separate parts of the aforesaid patented awning hoods, etc., furnished and sold. Settlements upon full and correct statements to be furnished by the said second party to the said first party in each and every month, shall be made on the 20th day of the month succeeding, and it is agreed that the minimum of said bonuses shall be ten thousand (10,000) feet of the sheet metal (running) for the first year, and for each succeeding year it shall increase at least ten thousand feet over and above that of the preceding year, said bonuses payable only for natural life of the said patents.

"Though not waiving any rights in case of liquidation or dissolution, the party of the first part agrees to allow the party of the second part to pay to the holders of the outstanding preferred stock of the company, its dividends prior to the settlements of said bonus at such times as it may be deemed necessary so to do by the party of the second part.

"That in witness whereof the parties of the above named (The Dr. Voorhees Awning Hood Company, Incorporated, by its president and secretary) have hereunto set their hands and seals the day, month and year written.

"[Seal.]                    Samuel Herbert Voorhees, 1st party.
            "The Dr. Voorhees Awning Hood Co., 2nd party.
                    "Per Samuel H. Voorhees, President.
                    "Per Wm. H. Shrader, Secretary."

17. The instrument above quoted was never adopted as a contract of the company by any formal action of the board of directors, but a copy of it was pasted in the Minute Book (page 24) following the minutes of the meeting

last above mentioned, and the company continued to manufacture and sell the kind of awning hoods covered by Dr. Voorhees' patent.

18. At the meeting of the directors held on the 12th day of April, 1907, above mentioned, W. H. Hollister was elected general manager of the company to take the place made vacant by the resignation of Dr. Voorhees.

19. After the meeting of April 12, 1907, above mentioned, there were only three meetings of the board of directors. These were held on May 7, July 9, and August 6, 1907, Dr. Voorhees being absent from the last two.

20. On the 15th day of January, 1908, a petition in bankruptcy was filed, Dr. Voorhees being one of the petitioning creditors, and upon this petition the company was adjudged a bankrupt on the 2d day of March, 1908.

(For convenience of reference the succeeding findings of fact are placed under the numbers of the items to which they particularly apply, but they are of course to be considered as findings of fact for all purposes of the case.)

## Item 0.

21. Dr. Voorhees, while president of the company and while receiving a salary as such, sold stock of the company, for which a salesman employed to sell stock was to receive, under the action taken at the first meeting of directors above mentioned (see Minute Book, p. 2, and finding of fact No. 4), a commission of a certain number of shares of the stock of the company. There was no contract by which Dr. Voorhees was employed to sell the stock.

## Item 1.

22. While Dr. Voorhees was president of the company and receiving a salary as such he sold 1,400 shares of the company's stock, for which under the action taken at the first meeting of the directors above mentioned (see Minute Book, p. 2, and finding of fact No. 4), a salesman employed to sell stock was to receive a commission of $200. Dr. Voorhees supposed that he would receive the commission, and the company did pay him $138 on this account, leaving $62 unpaid. There was no contract between Dr. Voorhees and the company making him its agent for the selling of stock.

## Item 2.

23. In transacting business for the company Dr. Voorhees paid $23.80 for postage, stamps, stationery, car fare, etc., which has not been repaid.

## Item 3.

24. From the beginning of its operations until the date of its bankruptcy the company manufactured awning hoods in accordance with Dr. Voorhees' patent. There is no direct evidence that payments were made by the company in accordance with the contract dated the 9th day of December, 1905 (see finding of fact No. 8), for the first year, but no payment in accordance therewith was made for the use of the patent after the 9th day of December, 1906. The contract was formally annulled by the board of directors on the 12th day of April, 1907, when a new contract superseding the old one was executed. There is no evidence as to the quantity of metal used by the company in manufacturing awning hoods before the 12th day of April, 1907.

## Item 4.

25. Dr. Voorhees was employed and served as general manager of the company between the 9th day of December, 1905, and the 12th day of April, 1907. During this period the gross earnings of the company amounted to $3,178.06.

## Item 5.

26. The only by-laws which the company ever had were those adopted at what was called the organization meeting (see Minute Book, p. 2, and finding of fact No. 3) and article 5 thereof is as follows:

### "Article V—Duties of President and Vice President.

"The president, who must also be a director, shall preside at all meetings of the stockholders and directors. In his absence, or in case of disability

of the president, the first vice president shall act in his stead in all matters pertaining to the office of the president. The second and third vice president shall keep themselves familiar with the affairs of the company, and perform such duties as they may be called upon to perform by the board of directors.

"The president shall have general supervision of the affairs of the company, shall sign and countersign all certificates of stock, contracts and other instruments of the company, as authorized by the directors; shall make reports to the stockholders and directors, and perform all such duties as are incident to his office, or may be required by the board of directors."

### Item 6.

27. The salary of the president for the months of November and December, 1906, and January, February, and March, 1907, was paid in accordance with the resolution adopted at the meeting of the board of directors held on the 4th day of December, 1906 (see Minute Book, p. 17, and finding of fact No. 14).

### Item 7.

28. There is no evidence of the amount of metal used by the company in manufacturing awning hoods between the 12th day of April, 1907, when the second license contract was executed, and the date of the bankruptcy.

### Item 8.

29. There is no evidence that the company used or manufactured any "metal parts and fixtures," that being a term used in the contract of December 9, 1905 (see finding of fact No. 8) or any "additional or separate parts," that being a term used in the contract of April 12, 1907. (See finding of fact No. 16).

### Item 9.

30. During the time that Dr. Voorhees was president of the company and was receiving a salary as such, he sold awnings and awning hoods which the company had manufactured. The regular salesman's commissions on the sales that he made would be $92.05. There was no contract by which he was made a salesman of the company, and he was never required by the board of directors to make sales of that kind.

### Item 10.

31. After the election of W. H. Hollister as treasurer and general manager of the company (see Minute Book, p. 12, and finding of fact No. 18), he had general and complete charge of the business of the company.

32. Quite a number of orders, amounting in all to about $1,600 were received by the company while Hollister was in charge of it, but for some reason were not filled. Many of these orders appear on the books of the company, and are marked "canceled," while others do not appear at all. Failure to fill these orders did not cause the bankruptcy of the company, nor even contribute to it so far as the evidence discloses.

33. Some small items of money paid to the company cannot now be found on the company's books, but the amount is not sufficient to make the loss of it, if there was a loss, a contributing cause of the bankruptcy.

34. The treasurer who preceded Hollister kept the company's money in a bank in Scranton. Hollister was vice president of a bank at Avoca. When he became treasurer he deposited the company's money in the bank at Avoca and drew it out on checks signed by himself alone, as treasurer of the company, without the checks being countersigned by the president in accordance with article 5 of the by-laws (see finding of fact No. 26). This was done although there was money of the company in the Scranton bank at the time, and although Hollister had in his possession a large number of blank checks of that bank which had already been countersigned by the president.

35. About four months before the petition in bankruptcy was filed a judgment was obtained against the company, and was very soon followed by other judgments. An execution was issued on the first judgment, but a sale thereunder was continued from time to time, and bankruptcy intervened

before a sale occurred. W. F. Hollister personally assumed liability for this judgment, and in October, 1908, several months after the bankruptcy, he took an assignment of it to himself. It does not appear that Hollister either willfully or through mismanagement reduced the company to insolvency.

### Item 11.

36. The articles of incorporation contained the following paragraph:

"The place where the principal business of this corporation shall be transacted is Huron, in the county of Beadle, state of South Dakota, but a business office may be located at Scranton, Pennsylvania where meetings of the directors and stockholders may be held for the transaction of business."

37. Dr. Voorhees had an office in Scranton, which for a while was used as the office of the company, and the company paid $5 on account of the office expense each month. Then the company opened an office of its own in Scranton, and stopped paying for the use of Dr. Voorhees' office. Later the company's office was moved to Avoca, where the manufacturing was done. After the company's office was moved to Avoca, Dr. Voorhees had in his office a desk, typewriter, lamp, some paper, booklets and samples of awning cloth, belonging to the company, which he used in transacting the business of the company. It does not appear by whom, or at what time, the company's property was placed in Dr. Voorhees' office. About the time of the bankruptcy some one on behalf of the company tried to take this property to the company's office at Avoca, but Dr. Voorhees refused to let it go, on the ground that the articles of incorporation required the company to maintain an office at Scranton. Dr. Voorhees paid no additional rent and was put to no additional expense on account of the company's property being in his office.

### Item 12.

38. In collecting $10 due the company Dr. Voorhees received a check for $20, giving $10 of his own money as change. He turned the check over to the company and received the company's check for $10 in repayment of the money he had paid out. By an error he was charged on the books of the company with the $10 the company had paid him, but was not credited with the $10 he had paid for the company. Afterwards the company paid him the amount that was due according to the account as it appeared on the books, and he received $10 less than he would have received had the error not occurred. There is no evidence that Dr. Voorhees was entitled to receive the amount that was due him according to the account.

\* \* \* \* \* \* \* \* \* \* \* \* \*

### Discussion of Items.

### 0. "Stock Due on Commissions Not Issued, Shares 1705."

The testimony as to this item appears on pages 5 to 9, and pages 103 to 113.

The claim is for shares of stock of the bankrupt corporation alleged to have been earned by the claimant in selling other stock of the corporation to various persons. The purpose of this proceeding is to ascertain what sum of money, if any, the bankrupt owes the claimant, in order that he may participate with other creditors in any distribution that may be made of funds coming into the hands of the trustee. The conflict of interest is between creditors only, and not between stockholders, who, for the purpose of contests between themselves, are not represented on the record. To enter an order in this proceeding that the claimant is entitled to certain shares of the corporate stock of the bankrupt would be a denial of the right of the stockholders, who alone would be affected by the order, to their day in court. The claimant's right to shares of stock should be determined in another proceeding, at which the stockholders are represented, and such a proceeding can be had if it develops that the bankrupt is in fact solvent after all. Therefore this part of the claim is disallowed, without regard to its merits, and without prejudice to the right of the claimant to establish his claim later in an appropriate proceeding.

1. "Cash Commissions on Stock Sales, Balance Estimated, $62."

The testimony as to this item appears on pages 5 to 12 and 103 to 113.

The claimant sold 1,400 shares of the capital stock of the bankrupt corporation, supposing that he was entitled to receive compensation in the form of a selling agent's commission in the sum of $200, of which amount the company paid the claimant $138, leaving unpaid the $62 now claimèd.

When the sales were made Dr. Voorhees was president of the corporation, and as such was receiving a salary. There was no contract between him and the corporation making him its agent for the selling of stock. The claimant refers to the minutes of the first meeting of the board of directors (Minute Book, p. 2) as a contract, where the following appears: "The following ways and means were then adopted on motion put and carried to meet the past, current and future expenses and to provide working capital. The treasury stock to be offered for public subscriptions in the following blocks: First block, 1,000 shares of preferred stock at par, $1.00 each, combined with a bonus of 5,000 shares of common. Salesman's commission, equal to bonus. Second block 2,000 shares preferred at par, with a bonus of 5,000 common, salesman's commission equal to bonus, or 20% of cash received. Third block, 5,000 preferred with bonus of 5,000 common, commission equal to bonus or 15%. Fourth block 10,000 preferred, with bonus 5,000 common. Commission equal to bonus, or 10%. With the exception of the first block, which must be cash, subscriptions must be paid 10% down and 10% monthly until fully paid up. And if this be not sufficient the officers were authorized to take any other necessary steps to advance the interests of the organization and place it in active operation." In this there is no contract with the claimant. The action taken could not be construed as the making of a contract with any one. It was nothing more than the fixing of the amount of commissions that salesmen were to receive when employed to sell stock. In addition to this the claimant testified (page 111): "We agreed to pay everybody who sold stock. We actually agreed that everybody who sold stock should get commissions. We (the stockholders) agreed to it. We talked it over in a sort of a friendly manner all together." Loose talk of this kind could not be made to serve as a contract, especially with one who was president of the company. So the question now is down to whether the claimant can recover a salesman's commission for selling stock of the corporation while he was its president, in the absence of an express contract on the part of the company to pay such commission.

If the selling of stock was incidental to the claimant's discharge of his duties as president, then of course there could be no recovery. The by-laws provide as follows: "The president shall have general supervision of the affairs of the company, shall sign, or countersign all certificates of stock, contracts and other instruments of the company, as authorized by the directors; shall make reports to the stockholders and directors, and perform all such other duties as are incident to his office, or may be required by the board of directors." It is hard to get away from the idea that selling stock in a company immediately after its organization, when it had no cash capital whatever, and when its most pressing and principal business was obtaining capital for its anticipated operations, which was the situation of this company, was incident to a "general supervision of the affairs of the company." Certainly the finding of persons to solicit subscribers, and their employment, and the supervision of their work, would be incident to the supervision of the affairs of the company. If the president instead of supervising the work of others in selling stock chose to take his time from that employment and to use it in making sales himself, he would not be rendering any additional service to the corporation, but merely substituting one kind of service for another. It has been held that selling stock does not come within the scope of the duties of a director. Cheeney v. L. B. & M. R. Co., 68 Ill. 570, 18 Am. Rep. 584. But the recovery in that case was on an express appointment of the director as a special agent of the corporation before the stock was sold, and later, when the same case came up again (L. B. & M. R. Co. v. Cheeney, 87 Ill. 446) the court avoided a decision of the question whether the director could recover compensation for selling stock where the board of directors had sent him to obtain subscriptions for stock without taking any action relative to his com-

pensation. In Kilpatrick v. Penrose Ferry Bridge Co.. 49 Pa. 118, 88 Am. Dec. 497, the treasurer raised money, and the president supervised the building of a bridge in addition to raising money and carrying on litigation, yet no compensation was allowed. The Supreme Court of Pennsylvania in Martindale v. Wilson-Cass Co., 134 Pa. 348, 19 Atl. 680, 19 Am. St. Rep. 706, refused to decide whether the president of a corporation can recover on a quantum meruit for services rendered to the corporation outside of his official duties, because the question was not raised by the record. But the rule in Pennsylvania, as it appears from the later cases, is that an officer of a corporation cannot recover compensation for services of any kind rendered by him to the corporation, except upon an express contract of employment made before the services are performed. Althouse v. Cobaugh Colliery Co., 227 Pa. 580, 76 Atl. 316; Brophy v. American Brewing Co., 211 Pa. 596, 61 Atl. 123; Grafner v. Street Railway Co., 207 Pa. 217, 56 Atl. 426; Bair & Gazzam v. Vandersaal, 36 Pa. Super. Ct. 615. The doctrines of ratification and estoppel have never been applied in Pennsylvania, although recognized in some other states. See 10 Cyc. 900, par. 5, and 922, par. "b." In C.. M., C. & S. Co. v. Toponce, 152 U. S. 405, 14 Sup. Ct. 632, 38 L. Ed. 493, which seems to be the only case of the kind that has come before the Supreme Court of the United States, that court sustained a recovery on a quantum meruit, in an action by one who had been employed and had served for several years as the superintendent of a corporation, in the absence of an express contract for compensation, although the plaintiff was also vice president and a director of the company. In that case, however, the offices were nominal, neither charter nor by-laws cast any special duties upon either vice president or director, and all of the corporate stock, except enough to qualify some dummy directors, was owned in about equal proportions by two men, the plaintiff and one who was called the president, and between these two men there was from the beginning an understanding that the services were to be paid for, although the amount had not been agreed upon. The facts here are quite different. This item of the claim is disallowed.

## 2. "Incidental Expenses, President's Office, $23.80."

The testimony as to this item appears on pages 13 and 14 and 113 to 116.

The charge is for petty expenditures of cash made by the president for postage stamps, stationery, car fare, etc., in conducting the company's business, and of which the claimant kept no account, except a memorandum of the amounts, without any designation of what the items were for. He testifies positively as to the amount of the total, giving in a general way the nature of the items and specifying a few from memory. There is enough to support a finding of fact that the money was expended, and the claim is allowed.

## 3. "Bonus License Contract from December 9, 1905, to April 12, 1907. $67."

The testimony as to this item appears on pages 14 to 23, 116 to 122, 158, 170, and 171.

The bonus is claimed under the license contract dated December 9, 1905, given in full in the findings of fact. It is 1 cent a running foot on all sheet metal work, and one-eighth of a cent on all metal parts and fixtures. According to the contract the minimum amount of sheet metal was to be 20,000 feet during the second year of the contract, and the claim is for the bonus accruing at the minimum rate, between the 9th day of December, 1906, the beginning of the second year, and the 12th day of April, 1907, when the contract was formally annulled by the board of directors, and a new contract authorized and made. The original contract, at first unauthorized, was not exactly ratified by the board of directors by their act of annulling it; yet that act did not repudiate it, but recognized it as in force up to that time. The company had the use of the patent, and it should pay for it, although the right of the claimant to recover on the contract is by no means free from doubt. Charter Gas Engine Co. v. Charter, 47 Ill. App. 36. If the contract was invalid, the value of the use of the patent would have to be shown. In re Bevier Wood Pavement Co. (D. C.) 19 Am. Bankr. Rep. 462, 156 Fed. 583. If it was valid, the claimant would have to show what amount was due under its terms when it was abandoned. This he has not done. The contract

does not provide for a rate of payment based on the time during which the patent was used. On the contrary the amount to be paid is based on the quantity of metal used. There is a further provision that payment for a certain number of feet of metal should be made each year, no matter how much had been used. But this latter provision could not become operative, for the purpose of fixing the amount that was due on the contract, until the end of the year. The company was not bound to use any given quantity of metal in any period short of a year. Before the end of the year the right to recover, in a suit for the amount due on the contract, did not depend upon the length of time during which the patent had been used, but was by the terms of the contract expressly made to depend upon the number of feet of metal used. This item is disallowed.

### 4. "1 per cent. Business (estimated) to April 12, 1907, $33."

The testimony as to this item appears on pages 16 to 18, 20 to 23, 38, 41, 44, and 165 to 171.

The claim is for 1 per cent. of the gross earnings of the company between December 9, 1906, and April 12, 1907, being the salary which the claimant was to receive as general manager of the company under the contract of December 9, 1905. The trustee admits (testimony, p. 17) that the claimant was employed and served as general manager until the 12th day of April, 1907. The contract can be used to fix the amount of compensation, appearing to be reasonable, having been acted upon, and having been recognized by the board of directors in their act of annulling it. The claimant estimated the gross earnings for the period at $3,300, and the trustee, from the books of the company (testimony, p. 44) admitted that the correct amount was $3,178.06. This item is allowed in the sum of $31.78.

### 5. "President's Salary from April 12, 1907, to April 29, 1908, $744."

The testimony as to this item appears on pages 23 to 25, 158, and 165 to 171.

At a meeting of the board of directors held on the 4th day of December, 1906 (M. B. p. 17), the following action was taken: "On motion by Berge, seconded by Hixon, the salary of the president, beginning November 1, 1906, was to be fixed for the ensuing year at $60.00 per month, in lieu of his (the president's) forfeiting all prior claims for salary and commission. Carried. Correction, excepting any stock commission entitled to prior to the passing of this motion." The claimant continued to serve as president until the bankruptcy, and still holds the office, although superseded, with all the other officers of the corporation, in the administration of the bankrupt's affairs, by the trustee. The petition was filed on the 15th day of January, 1908, up to which time there can be no doubt of the claimant's right to salary, although he seems to misconceive the basis of his right, apparently claiming under the contract of April 12, 1907, instead of the resolution of the board of directors above quoted. The making of a contract with the claimant was authorized by the board of directors at the meeting held on the 12th day of April, 1907 (M. B. 23), as follows: "Motion by Hackett, seconded by Helmer, that the president and secretary be authorized to execute and sign a new license agreement between S. H. Voorhees and this company, to take the place of the old contract, which is hereby annulled, approved." This action authorized the making of "a new license agreement" "to take the place of the old contract." What the terms of the new agreement were to be are not disclosed. That they were to be different from those of the old contract is manifest from the fact that a new one was contemplated. The fact that the signing of a new contract was authorized immediately after the claimant's resignation as general manager, and the fact that the former contract had provided for his employment in that capacity, would naturally lead to a supposition that a part, at least, of the contemplated change had reference to the employment of the claimant. Yet there is nothing in the resolution that can be construed as giving authority to make a contract fixing the compensation of the claimant as president of the company. The by-laws provide that "the board of directors shall fix the compensation of the officers and agents of the company." The resolution did not expressly, nor even by implication, delegate this power

to fix the president's salary, and the contract, in so far as it attempted to deal with the salary which the claimant was to receive as president, was of no effect. A power expressly vested in the board of directors cannot be exercised by the president, and a delegation of power to make a contract of a certain kind does not include authority to enter into a collateral agreement of another nature. Bangor Street Railway Co. v. American Bangor Slate Co., 203 Pa. 6, 52 Atl. 40; Twelfth Street Market Co. v. Jackson, 102 Pa. 269.

The contract, therefore, did not affect the right of the president to the salary of $60 a month, fixed by the board of directors, which remains unpaid for the period between the 12th day of April, 1907, and the 15th day of January, 1908, 9 $\tfrac{1}{10}$ months, and amounts to $546.

Salary which was to accrue after the date of the bankruptcy cannot be recovered. The test is whether the right to recover existed at the time the petition in bankruptcy was filed. Re Pettingill & Co. (D. C.) 14 Am. Bankr. Rep. 728, 137 Fed. 143. The right to recover depended upon the president's continuance in office. When the petition was filed the claimant had a right to recover salary earned at that time. but not the unearned salary to accrue in the future. In re Inman & Co. (D. C.) 22 Am. Bankr. Rep. 524, 171 Fed. 185. This item is allowed in the sum of $546.

### 6. "President's Salary from April 1, 1907, to April 12, 1907, $24."

The testimony as to this item appears on pages 25, 26, 158, and 165 to 171. This item seems to have been separated from No. 5 because supposed to be upon a different footing. Salary for these few days is claimed under the resolution of the board of directors adopted at the meeting of December 4, 1906 (M. B. p. 17), and, of course, should have been paid. The trustee claims that it has been paid. The resolution provides that the salary was to start on the 1st of November, 1906, a little more than a month earlier. The trustees take the position that the resolution in so far as it relates to back salary was void, citing Loan Association v. Stonemetz, 29 Pa. 534, and Kilpatrick v. Penrose Ferry Bridge Co., 49 Pa. 118, 88 Am. Dec. 497. As the salary for November, December, January, February, and March was paid, he thinks that the amount of money received should be applied on the salary accruing after the date of the resolution. The reason for the rule given in the cases cited is that there is lack of consideration. There was a consideration for the action of the directors in this instance. Dr. Voorhees surrendered all claims against the company for salary earned before the date to which the resolution related. The action was in the nature of a compromise of existing differences. The money has been paid and received on the strength of it. There is no evidence that it was not a fair and proper adjustment; and there is no occasion now to disturb it. This item of the claim is allowed.

### 7. "License Royalty, First Year, $100."

There is no testimony as to this item, the only evidence being the contract of April 12, 1907, under which the claimant was to receive a minimum bonus of $100 for the first year. The trustee takes the position that the claim is not provable, because only royalty on metal actually used could fall due before the end of the year, there is no evidence of the amount of metal used, a suit for the minimum royalty for the year could not have been maintained until the end of the year, and the company went into bankruptcy before the year had expired. This contention appears to be sound. The rights of the claimant are to be determined here as they would be in an action begun at the date of the bankruptcy. The question of the bankruptcy as a breach of the contract will be taken up in discussing item No. 10. Whatever the claimant could have recovered in an action begun at the date of the bankruptcy for the use of the patent up to that time would be allowed upon proper proof. But he has failed, as in item No. 3, to prove how much was due at that date under the terms of his contract. This item is disallowed.

### 8. "Royalty on Parts, $1."

See testimony, pages 28 and 29.

There is no evidence whatever in support of this item, and it is disallowed.

9. "Commission on Sales of Merchandise to April 29, 1908 (estimated), $92.05."

Testimony as to this item appears on pages 29 to 34, 121 to 131, and 138.

There was no contract with the claimant making him a salesman of the company's products, and, for the reasons given in discussing item No. 1, this item is disallowed.

10. (This item is not repeated here as set forth in the claim, because of its length.)

For testimony, see pages 34 to 37, 45 to 96, 138 to 165, 189 to 207, 210, 224 to 270, and 278 to 296.

This item is a bill against the receiver, and, with the exception of the last charge, is for work done for the receiver. There is no evidence to support these charges, and they seem to have been overlooked. It is only fair to the claimant to let him produce his evidence, and therefore action upon these charges is deferred.

The last charge, while made as a claim against the receiver as for his violation of the license contract, has been treated at the hearings as a claim against the estate in bankruptcy, and the proceeding has been considered as one to liquidate the claim under an order of court, although no such order has actually been made, except the order, made after the hearing of testimony, authorizing the referee to pass upon all claims of Dr. Voorhees, including those against the receiver. Precedents for this irregular practice can be found in Re Buchan's Soap Co. (D. C.) 169 Fed. 1017, and in Re Duquesne Incandescent Light Co. (D. C.) 24 Am. Bankr. Rep. 419, 176 Fed. 785.

The claim really is for the minimum royalty (called a bonus in the contract) that was to accrue after the date of the bankruptcy, during the remainder of the life of the patent. Whether this is a provable claim is the most important question in the case, because of the large amount involved.

The claim is for $14,647.84, which is considerably in excess of any amount that could be recovered for a breach of the contract at the date of the bankruptcy.

In computing such amount consideration of the sums mentioned in the contract would have to be confined to the bonuses, for the part of the contract providing for the payment of the salary of 1 per cent. of the gross sales is void for the reasons given in discussing item No. 5. If it were not, the salary to accrue after the bankruptcy would not constitute a provable claim. In re Inman & Co., supra. If this part of the contract were construed as an employment of the claimant as president to the date of the expiration of the patent, then, as to that part, even if authorized by the board of directors, it would be void, because attempting to prevent succeeding boards of directors from exercising an untrammeled choice in electing a president each year as provided by law. West v. Camden, 135 U. S. 507, 10 Sup. Ct. 838, 34 L. Ed. 254.

The minimum royalty was to be $100 for the first year, $200 for the next, $300 for the next, and so on, increasing by $100 each year. From the date of the contract, April 12, 1907, to the expiration of the patent, September 5, 1922, the royalty would be $12,762.66, from which would have to be deducted any amount allowed on item No. 7, if there was error in disallowing that item of the claim.

There is another feature that should be taken into consideration. As the royalty was to fall due from time to time in the future, only the value thereof at the date of the bankruptcy could be allowed if the payments to be made in the future were held to become payable at that time. By a computation which may not be correct, I find the present value of the future payments on the 15th day of January, 1908, would be $8,092.10.

Then there would be the question of the measure of damages, but that will be taken up later on.

Dr. Voorhees bases his claim for advanced royalties on two grounds, which are stated by his counsel as follows:

First (testimony, p. 45): "The claimant proposes to prove by the books of the company that during the year commencing on December 9, 1906, and ending April 12, 1907, that the management of the company so conducted the

business of the company as shown by the ledger and their various transactions —which we will offer in evidence—that they destroyed the business utterly. and that by reason of such laches and such destruction of business the total amount of the minimum bonuses for the entire life of said patents became due and payable prior to the time of the adjudication in bankruptcy. This, for the purpose of establishing claimant's demand for $14,802.79, being the minimum bonus for the life of said patents."

Second (testimony, p. 35): "As to the general exception filed by the trustee in this claim, the claimant asserts that the contract between the Dr. Voorhees Awning Hood Company and Samuel Herbert Voorhees was a manufacturing and license contract: There were two contracts; one was a manufacturing and selling license dated the 9th day of December, 1905, and the other was a manufacturing and selling license dated the 12th day of April, 1907. By the terms of these manufacturing and selling licenses Dr. Voorhees, the owner of the patent. transferred to the Dr. Voorhees Awning Hood Company the right to manufacture and sell certain patented articles under certain stipulations in said contract; that under the terms of the contract this license was to run during the term of the patents, and that the company, as a company, assumed liability for the entire minimum contained in each of these manufacturing and selling contracts for the life of all patents connected therewith and all matters embraced in said contracts; that in violation of their contract the Dr. Voorhees Awning Hood Company suffered an act of bankruptcy on the 15th day of January, 1908, and thereby terminated the contract. entered into between the parties to the said contracts and became liable at once for the minimum royalties, bonuses, and commissions specified in the several contracts. Not only that, but they also became liable to damages for such violations as is shown, in part. by the objection filed by the trustee in bankruptcy, which objection alleges that this item is a claim for commissions which accrued subsequent to the filing of the petition for adjudication in bankruptcy, and the claim of the creditor is that the damages, commissions, etc.. all of them became due at that time. and knows they were to be allowed in this transaction."

Before taking up the question whether there was a breach of the contract. it should be noted that the royalty for the term of the patent was not made payable upon the bankruptcy of the corporation, or upon the happening of any other event, and that if there was a breach the measure of damages would have to be determined by the ordinary rules of law unaffected by any special provisions of the contract.

The evidence as to the first ground is that some orders sent in to the company were not filled, that some money paid to the company could not be found entered in the ledger. that W. H. Hollister, who succeeded Dr. Voorhees as general manager, and who was also treasurer, deposited money in a bank of which he was vice president, instead of in the bank where the former treasurer had kept his account, that Hollister drew money from his bank, while there was money in the other bank, without having the checks countersigned by the president as required by the by-laws, that judgments were recovered against the company, that an execution was issued on one of them. that continuances of the sheriff's sale were made from time to time for nearly four months, that W. H. Hollister personally assumed liability for this judgment, and in October, 1908, several months after the bankruptcy, took an assignment of it to himself. The orders not filled, including those not accounted for on the books, amount to about $1,600. So at most the company's possibility of gross receipts was reduced that much. What part would have been profit does not appear. Perhaps there would not have been any profit. Possibly the orders were refused because there would have been no profit in filling them. Many were marked "Canceled" on the books of the company. There is nothing to show that they were not countermanded before they could be filled. In any event the fact that these orders were not filled could not have been the cause of the company's failure, and the evidence does not even tend to prove that it contributed substantially to it. It is true that W. H. Hollister disregarded the by-laws in issuing checks not countersigned by the president, but no material harm has come of it, and countersigning, as it was practiced, was no safeguard, for Hollister had in his possession a checkbook

containing a large number of blank checks countersigned by the president. In assuming liability for the judgment Hollister does not appear to have injured any one except himself. Possibly the continuing of the sheriff's sale from time to time might have resulted in a preference had not the bankruptcy prevented it. But no preference was obtained, and no harm done by the judgment that is not incident to the enforcement of the rights of a creditor by process of law. If W. H. Hollister, alone, or with others, had willfully wrecked the company, Dr. Voorhees would have had no right of action on that account against the company, which would itself have been more sinned against than sinning. The theory has been advanced during the hearings that the company by not preventing itself from being wrecked by mismanagement committed a breach of the contract. If there was any one whose duty it was to act for the company in preventing mismanagement, it was Dr. Voorhees himself. Another theory of the argument is that the management on the part of some of the officers, principally W. H. Hollister, who had full charge, was the act of the company itself. But no gross mismanagement has been shown. It does not appear that the financial condition of the company was actually any worse at the end of the Hollister régime than it was at the beginning. For all that the evidence discloses, the company may have been in worse condition when Hollister took hold of it than it was when it went into bankruptcy. But if there had been mismanagement, there was no one in a better position to put a stop to it than Dr. Voorhees, and he seems to have done nothing further than to protest against some things that he did not like, in a report to the board of directors, and to write some letters to Mr. Hollister (testimony, pp. 217–223) which principally concerned his own account with the company, and in one of which, dated June 22, 1907, he said: "As the management is up to you, of course, I will leave it in your hands." But neither theory is sound. The test is whether there was a breach of the contract, and there was none unless the bankruptcy itself constituted a breach.

The absolute renunciation of a contract constituted such a breach as to justify immediate action and recovery therefor. Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953. In the case cited the Supreme Court of the United States held that there is no controlling distinction between cases of renunciation before the arrival of the time of performance and those of renunciation of unmatured obligations of a contract while it is in course of performance. It was held broadly by the Circuit Court of Appeals of the Sixth Circuit, in Re Neff, 19 Am. Bankr. Rep. 23, 157 Fed. 57, 84 C. C. A. 561, 28 L. R. A. (N. S.) 349, that "bankruptcy is a complete disablement from performance and the equivalent of an out and out repudiation, subject to the right of the trustee at his election to rehabilitate the contract by performance." It would seem, without anything further, that the bankruptcy constituted a breach of the claimant's contract for which he could recover damages. In re Spittler (D. C.) 18 Am. Bankr. Rep. 425, 151 Fed. 942. But it is necessary to look further to see if such is really the case.

The first case cited in Re Neff, supra, in support of the proposition that bankruptcy is of itself a breach of an executory contract, is In re Swift, 7 Am. Bankr. Rep. 374, 112 Fed. 315, 50 C. C. A. 264. That was a voluntary bankruptcy. The second case cited is In re Pettingill & Co. (D. C.) 14 Am. Bankr. Rep. 728, 137 Fed. 143, which seems from the language used to have been a voluntary bankruptcy. This appears to be true of In re Neff also. The principle of these cases, as stated in Lovell v. Mutual Life Insurance Co., 111 U. S. 264, 4 Sup. Ct. 390, 28 L. Ed. 423, which is cited in Re Swift, is that "where one party to an executory contract prevents the performance of it, or puts it out of his own power to perform it, the other party may regard it as terminated, and demand whatever damage he has sustained thereby." Yet in Carr v. Hamilton, 129 U. S. 252, 9 Sup. Ct. 295, 32 L. Ed. 669, also cited in Re Swift, where the principle, while not stated, was applied, the court held that an insurance company when dissolved at the instance of the superintendent of the insurance department of the state of its domicile, its assets thereupon being vested in the superintendent, "was put into a condition of absolute bankruptcy and liquidation," and, therefore, that policy holders were entitled to an immediate valuation of their claims although payable far in

the future. In Re Duquesne Incandescent Light Co. (D. C.) 24 Am. Bankr. Rep. 419, 176 Fed. 785, where the bankruptcy was involuntary, the court held that the bankruptcy constituted a breach of an executory contract, without discussing the question, evidently taking it for granted that any bankruptcy is a breach. So it may be that it makes no difference as to the provability of a claim of the kind made here whether bankruptcy be voluntary or involuntary, although a distinction was drawn in Re Imperial Brewing Co. (D. C.) 16 Am. Bankr. Rep. 110, 143 Fed. 579, and in Inman & Co. (D. C.) 23 Am. Bankr. Rep. 566, 175 Fed. 312. But in this particular case it is hard to see how the principle can be applied, for the claimant was one of the petitioning creditors. This fact appears only by the records of the court, but it is a proper subject of judicial notice. In re Imperial Brewing Co., supra. As the claimant was instrumental in bringing on the bankruptcy, if there was a breach it was of his own doing. Surely he could not have a cause of action for a breach which he himself committed, or took part in committing. Jordan v. Miller, 25 Kan. 572; Marshall v. Craig, 1 Bibb (Ky.) 386; Cape Fear & D. R. Nav. Co. v. Wilcox, 52 N. C. 481, 78 Am. Dec. 260.

But aside from that, his claim is not believed to be provable. The royalty that he was to receive for the use of his patent more nearly resembles rent for the use of land, than anything else, and it has been uniformly held that rent to accrue after the bankruptcy is not a provable claim. Shapiro v. Thompson, 24 Am. Bankr. Rep. 91, 160 Ala. 363, 49 South. 391, and note. In re Roth & Appel (D. C.) 22 Am. Bankr. Rep. 504, 174 Fed. 64, affirmed (C. C. A.) 24 Am. Bankr. Rep. 588, 181 Fed. 667; Watson v. Merrill, 14 Am. Bankr. Rep. 453, 136 Fed. 359, 69 C. C. A. 185, 69 L. R. A. 719.

In the first case cited, the Supreme Court of Alabama held that bankruptcy does not sever the relation established by contract between landlord and tenant, simply on the ground that "the plain language of the act leads to the contrary conclusion." In the second case Judge Hough, of the Southern District of New York said: "It must be admitted (and is not denied by any party to the litigation) that the rent reserved in a lease is payable only at the dates prescribed in the lease, and until that date arrives and payment is not made the lessee is not liable for any installment sued on his rent contract or for damages measured by it. It appears to me plain that this situation as between lessor and lessee is not altered by any bankruptcy on the part of the lessee. Bankruptcy does not terminate the lease. This must be so from the very nature of bankruptcy, which does not destroy but conserve property, and the leasehold estate is property which may (and frequently does) become the property of the trustee and inure to the benefit of creditors. It is impossible to conceive of a trustee in bankruptcy selling a lease if bankruptcy destroys the same lease. If the lease survives adjudication and is rejected by the trustee (i. e., not appropriated as belonging to the estate), it is necessarily an existing and continuing contract, and such contract requires parties thereto. Who are these parties? The landlord is one. The trustee in bankruptcy, not having appropriated the lease, is not the other; therefore that other must be the bankrupt lessee." The third case, which is the only one cited in Judge Hough's decision, the Circuit Court of Appeals of the Eighth Circuit said: "An adjudication in bankruptcy does not dissolve or terminate the contractual relations of the bankrupt, notwithstanding the decisions to the contrary, in Re Jefferson (D. C.) 2 Am. Bankr. Rep. 206, 93 Fed. 948; Bray v. Cobb (D. C.) 3 Am. Bankr. Rep. 788, 100 Fed. 270; and in Re Hays, Foster & Ward Co. (D. C.) 9 Am. Bankr. Rep. 144, 117 Fed. 879. Its effect is to transfer to the trustee all the property of the bankrupt except his executory contracts, and to vest in the trustee the option to assume or to renounce these. It is the assignment of the property of the bankrupt to the trustee by operation of law. It neither releases nor absolves the debtor from any of his contracts or obligations, but, like any other assignment of property by an obligor, leaves him bound by his agreements, and subject to the liabilities he has incurred. It is the discharge of the bankrupt alone, not his adjudication, that releases him from liability for provable debts in consideration of his surrender of his property, and its distribution among the creditors who hold them. Even the discharge fails to relieve him from claims against him that are not provable in bankruptcy, and since his obligation to pay rents which are to

187 F.—40

accrue after the filing of the petition in bankruptcy may not be the basis of a provable claim, his liability for them is neither released nor affected by his adjudication in bankruptcy, or by his discharge from his provable debts. One agrees to pay monthly rents for the place of residence of his family or for his place of business, or to render personal services for monthly compensation for a term of years; he agrees to purchase or to convey property; and he then becomes insolvent and is adjudicated a bankrupt. His obligations and liabilities are neither terminated nor released by the adjudication. He still remains legally bound to pay the rents, to render the services, and to fulfill all his other obligations, notwithstanding the fact that his insolvency may render him unable immediately to do so. Nor are those who contracted with him absolved from their obligations. If he or his trustee pays the stipulated rents for his place of residence or for his place of business, the lessors may not deny to the payor the use of the premises according to the terms of the lease. If he renders the personal services he who contracted to pay for them may not deny his liability to discharge this obligation. His trustee does not become liable for his debts, but he does acquire the right to accept and assume or to renounce the executory agreements of the bankrupt, as he may deem most advantageous to the estate he is administering, and the parties to those contracts which he assumes are still liable to perform them. And so throughout the entire field of contractual obligations the adjudication in bankruptcy absolves from no agreement, terminates no contract, and discharges no liability. In re Curtis, 9 Am. Bankr. Rep. 286 [109 La. 171, 33 South. 741]; In re Ells (D. C.) 3 Am. Bankr. Rep. 564, 98 Fed. 967, 968; Witthaus v. Zimmermann [91 App. Div. 202], 86 N. Y. Supp. 315; White v. Griffing, 44 Conn. 437, 446, 447; In re Pennewell, 9 Am. Bankr. Rep. 490, 119 Fed. 139, 55 C. C. A. 571."

This view of the case, however, overlooks entirely an actual condition resulting from the bankruptcy of a corporation, which is that the bankrupt is practically if not legally defunct, and exists, if at all, in name only. Whether the bankruptcy of a corporation is a breach of a contract, when the bankruptcy of an individual would not be; whether a corporation exists in contemplation of law after bankruptcy; and whether bankruptcy works a de facto dissolution of a corporation so that the rights of all parties should be determined as upon an actual dissolution, are interesting questions which need not be dealt with at this time, because they do not affect the result. If a corporation does survive bankruptcy, it is, nevertheless, nothing but a bare legal entity, devoid of capital or property of any kind. It is no longer a "going concern." It is not even what Mr. Justice Dean in Cowan v. Pennsylvania Plate Glass Co., 184 Pa. 1, 14, 38 Atl. 1075, 1080, called a "stopping concern," but it is in a far worse plight. It is a concern that has completely stopped, and, without an infusion of new life, will never go again.

But even if the bankrupt corporation is defunct, that is, if it is rendered, not only in fact but in contemplation of law, incapable of carrying out the contract with the claimant, the claim seems to be one that is not provable, because contingent upon the very continuation of the contractual relation which the bankruptcy destroys. A contract of this character is fundamentally different from the contracts which have been held to be broken by the bankruptcy of one of the parties. In each of those cases the other party to the contract had a right to expect performance regardless of what might afterwards occur, and was injured by nonperformance. Here, as in the case of a lease, the basis of the obligation to pay is the use of the property. When the contract is entered into there is no present consideration for the promised payments. The consideration flows from the use as time passes. The obligation to pay does not arise until the time for payment arrives without the previous occurrence of some event which has rendered the use impossible. If the thing to be used is wholly destroyed, the consideration fails, and the obligation to pay is at an end. An instance of this is the termination of a lease by the total destruction of demised premises, as a room in an upper story in a building which is burned. Paxson & Comfort Co. v. Potter, 30 Pa. Super. Ct. 615. Another is the release from liability to pay royalty for the use of a patent when the patent is declared invalid. Ross v. Fuller & Warren Co. (C. C.) 105 Fed. 510; Macon Knitting Co. v. Leicester Mills Co., 65 N. J. Eq. 138,

55 Atl. 401. Likewise where the continued use of the property is rendered impossible by the death of the party who was to use it. The rule is stated in Dixon v. Breon, 22 Pa. Super. Ct. 340, and reiterated in Wertz v. Klinger, 25 Pa. Super. Ct. 523, as follows: "Where a contract is entered into of a continuing character or to be performed at a future time dependent upon the continued existence of a particular person or thing, or the continuing ability of the obligor to perform, subsequent death, destruction, or disability will excuse the obligor from compliance with the terms of the contract: 1 Am. & Eng. Ency. of Law (2d Ed.) 590; 7 Am. & Eng. Ency. of Law, 147; Wells v. Callnan, 107 Mass. 514 [9 Am. Rep. 65]: and cases cited; Scully v. Kirkpatrick, 79 Pa. 324 [21 Am. Rep. 62]; Blakely v. Sousa, 197 Pa. 305 [47 Atl. 286, 80 Am. St. Rep. 821]; Stewart v. Stone [127 N. Y. 500, 28 N. E. 595], 14 L. R. A. 215, and note; Anderson v. May [50 Minn. 280, 52 N. W. 530], 17 L. R. A. 555 [36 Am. St. Rep. 642]." This rule was applied in Griffith v. Boom & Lumber Co., 46 W. Va. 56, 33 S. E. 125, a case of involuntary dissolution and liquidation of a corporation. The death of a tenant does not ordinarily terminate a lease, because there are representatives to continue the use. But the dissolution of a corporation does. 10 Cyc. 1313. In Dickinson v. Calahan, 19 Pa. 227, a contract by a lumber manufacturer to sell to a lumber dealer all the lumber sawed in a period of five years at the former's mill was held to have terminated at the manufacturer's death. In Blakely v. Sousa, one of the cases cited supra, the court said the contract is terminated "for the reason that neither of the contracting parties contemplated attempted performance by a substitute." When the contract in question was entered into neither of the parties contemplated attempted performance by another, and they must have had in mind as one of the conditions of performance the continued existence of the corporation, just as much as the continued existence of the patent itself. The essential nature of the contract is the same as though this condition were expressly stated. So when the corporation not by a voluntary act, but by operation of law, is rendered incapable of receiving the consideration for the promise to pay royalty, the obligation to pay royalty falls with the failure of the consideration, and a claim for future royalty is not provable. In a word, the claim is contingent upon the use, and further use has been rendered impossible. Deane v. Caldwell, 127 Mass. 242.

That the allowance of royalty payable in the future would be inequitable to the creditors of the bankrupt is manifest. It would be making them pay for what the bankrupt has not received and never can receive. If the contract is at an end the claimant has his patent freed from any contractual obligations, and to pay him for the use of it when he himself has it would be to let him "eat his cake and keep it."

One of the theories of the claimant seems to be, however, that his claim is for damages for a breach of the contract as distinguished from the amount that would become due under its terms, although he claims the full amount. In Watson v. Merrill, 14 Am. Bankr. Rep. 453, 136 Fed. 359, 69 C. C. A. 185, 69 L. R. A. 719, the court refused to recognize a distinction of this kind, saying: "It is, however, the nature of the claim, and not the name that is applied to it, that conditions its provability in bankruptcy." Yet if such a distinction were drawn, the result would be that the claimant would have to prove the extent of the injury occasioned by the breach, and this he has not done, nor can he do it. His actual damage would be the difference between the value of the right to use the patent and the amount which the bankrupt was to pay for it, if the price exceeded the value. There is no way of proving now what that difference would be. The value of the patent is highly speculative, and the damages would be just as much so. The case differs from In re Duquesne Incandescent Light Co. (D. C.) 24 Am. Bankr. Rep. 419, 176 Fed. 785, where the measure of damages was the difference between the contract price and the cost of manufacture, and both were shown by the evidence. There is here not even a "reasonable probability," recognized as sufficient under the circumstances in Williams v. Philadelphia, 208 Pa. 282, 57 Atl. 578. The extent of the injury must remain uncertain and contingent upon future events, possibly until the expiration of the patent, for under the rule stated in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, it would depend upon circumstances of which the claimant ought reasonably to avail himself. At any

rate the claimant has lost nothing but the benefit of his bargain, and before he could recover he would have to show that the bargain was a fair one. Hooven Mercantile Co. v. Evans Mining Co., 193 Pa. 28, 44 Atl. 277. Under the circumstances of the case it is doubtful that he could be allowed any benefit of his bargain—that is, the excess of the contract price over the value of the patent—if it could be measured.

There seems to be no ground upon which the claim for future royalty can be supported. There was no breach of a contract before the bankruptcy, upon which the claimant could have recovered the royalty payable thereafter, or damages for the breach. If the bankruptcy was of itself a breach, it was brought on by the claimant, and he cannot take advantage of it. But the bankruptcy was not a breach of the contract, whether the contract survives the bankruptcy or not. Of course there was no breach if the contract survives, and if it does not, it has come to an end in accordance with its implied terms, upon the happening of an event which renders its further continuation impossible. Yet even if bankruptcy is to be considered as a breach of all contracts of a bankrupt, including those of the kind upon which the claim is based, still royalty payable in the future is at most a contingent debt, and is, therefore, not provable in bankruptcy, and there is no proof of damages, which would be speculative in any event, and the claimant has not shown that he would be entitled to damages for the loss of the benefit of his bargain.

This item is disallowed, except the charges which are to be considered after the claimant has had another opportunity to prove them.

Possibly Dr. Voorhees has a valid claim against the receiver for the use of the patent, but he has presented none.

11. "Maintaining office of record, Coal Exchange Bldg., May, 1907, to and including October, 1908, at $5.00 per month, $90."

The testimony as to this item appears on pages 97 to 102, 131 to 137.

When it first began to do business the company used Dr. Voorhees' office in Scranton as its office, and paid $5 a month on account of the expense. Then for a while the company maintained an office of its own in the same building that Dr. Voorhees' office was in, and during this time no part of his office expense was paid by the company. Later the company's office was moved to another place, in another county. During this time, and possibly from the beginning, Dr. Voorhees had in his office a desk, a typewriter, a lamp, some paper, booklets, and samples of awning cloth belonging to the company, and used them in attending to the company's business. At or about the time of the bankruptcy some one on behalf of the company tried to take this property to the company's office, but Dr. Voorhees refused to let it go, on the ground that the law required the company to maintain an office in Scranton. He incurred no additional expense in keeping the furniture at his office, but merely continued to pay the same rent that he had been paying right along. His claim is for the same part of the expense that the company had previously paid, and no theory upon which it should be allowed has been advanced, possibly for the good reason that there is none. In Kilpatrick v. Penrose Ferry Bridge Co., 49 Pa. 118, 88 Am. Dec. 497, the meetings of the company were held at an office for which the president was paying rent. This item of the claim is disallowed.

12. "Surcharged check—Lindabury transaction, $10."

The testimony as to this item appears on pages 99 and 100.

In collecting $10 due the company Dr. Voorhees received a check for $20, giving $10 of his own money as change. He turned the check over to the company and received the company's check for $10 in repayment of the money he had paid out. Through some one's error he was charged on the books of the company with the $10 that the company had paid him, but was not credited with the $10 that he had paid for the company. Afterwards the company paid him what was due on his account according to the books, and so he received $10 less than he would have received had the error not occurred. He did not notice the mistake at the time, and now desires to have it corrected. The facts appear no more explicitly in the evidence than they

are here stated. It should have been shown that the claimant had a right to receive the money in the first instance, and it cannot be assumed that he did simply because the trustee has not undertaken to prove the contrary. This item is disallowed.

### 13 and 14.

"A protection note, for personally guaranteeing payment on goods bought from John Boyle & Co., N. Y., and Hoffman, Korr & Co., Phila., Pa. Said note being given by the bankrupt in March, 1907 (in conjunction with two others). $2,000."

"Protection note for indorsing the back of bankrupt's commercial note, given in May, 1907 (in conjunction with nine others). $5,000."

There is no evidence as to either of these items, except a reference to one of the notes (testimony. pages 81 to 84).

Evidently Dr. Voorhees indorsed two notes of the company, in one instance being one of 3 indorsers, in another being one of 10. The "protection notes" have not been produced, although they should have been attached to the affidavit. In re Blue Ridge Packing Co. (D. C.) 11 Am. Bankr. Rep. 36, 125 Fed. 619. No loss appears to have been sustained by reason of the indorsements. An indorser may not prove a claim under section 63 (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3447]) until he makes payment, and no attempt has been made to prove the claim in accordance with section 57 (l). Phillips v. Dreher Shoe Co. (D. C.) 7 Am. Bankr. Rep. 326, 112 Fed. 404. These items are disallowed.

The items allowed are as follows:

| | |
|---|---:|
| 2 | $ 23 80 |
| 4 | 31 78 |
| 5 | 546 00 |
| 6 | 24 00 |
| Total | $625 58 |

### Order.

Now, the 27th day of September, 1910, upon the evidence submitted to the referee, and after hearing arguments of counsel thereon, the amount due on all claims of Dr. Samuel Herbert Voorhees in this case, except those upon which a decision is herein reserved, is found to be $625.58, in which amount such claims are allowed. This order is made without prejudice to the right of the claimant to prove claims against the receiver for services rendered and for the use of the claimant's patent.

By the special order of the court above mentioned the time for filing a petition for a review has been fixed at 30 days.

[Signed]          W. L. Hill, Referee in Bankruptcy.

R. H. Holgate, for claimant.
A. L. Watson, opposed.

ARCHBALD, District Judge. A claim has been proved by Dr. S. H. Voorhees, which the referee, on exceptions by the trustee, has allowed in part, but refused as to the rest, and the case is brought here by the claimant to review this action.

[1] The bankrupt corporation was organized for the purpose of manufacturing and selling the awnings and awning hoods invented by Dr. Voorhees, for which he held United States letters patent. By agreement, December 9, 1905, the company was given the exclusive license to manufacture and sell these awnings within the limits of the United States, under this or any other patent that might be granted, for the term of such patent; in payment for which it was agreed to give Dr. Voorhees 51 per cent. of the capital stock of the company, make him the general manager, at a salary of 1 per cent. of the gross

earnings; and in addition to pay him a bonus of one cent. per running foot on all the sheet metal work, and one-eighth of a cent on all metal parts and fixtures. Statements were to be rendered by the company and payments made at the end of each month, and the minimum bonus was to be calculated on 10,000 feet of sheet metal the first year, with an increase of at least 10,000 feet on the preceding year for each year thereafter, for the life of the patent. The company, under this license, entered on the manufacture of hoods and awnings, and did some considerable business, paying Dr. Voorhees the accrued bonuses up to December 9, 1906, which covered the first year of the contract. No salary however seems to have been paid him up to that time; and on December 4, 1906, at a meeting of the directors, in which he participated, he waived all prior claims to salary and commissions, in lieu of which his salary, beginning with November 1, 1906, was fixed at $60 a month, and was paid to him at that rate until the 1st of April following.

On April 12, 1907, the first agreement was modified by another by which an exclusive license for the life of the patent was given to the company, the same as before, and in payment for it the claimant was to have 51 per cent. of the stock and a bonus of 1 cent a running foot on all hoods ready for erection and sold, and one-eighth of a cent on all additional parts, the minimum of which bonus was to be 10,000 feet of sheet metal the first year, with an increase of 10,000 feet on the preceding year, for each year of the patent, settlements for which were to be made monthly; and the claimant, as president, was to have a salary as before, of one per cent. on the gross sales of hoods and parts, with the proviso that, if this did not amount to $720 per annum, the difference should be made up to him out of the gross earnings. With the exception of this guarantee, there is no substantial difference between the two agreements. And it is out of them that the principal controversy in the case arises.

A claim is made, under the first agreement, for a percentage on gross earnings by way of salary as general manager, from December 4, 1906, to April 12, 1907, when the second agreement went into operation. The claimant served in that capacity for the period named, and the gross earnings being $3,178.06, he was entitled to $31.78, which the referee has allowed him. He has also been allowed $24 for 12 days' salary, at the rate of $60 a month, from April 1 to April 12, 1907; which clears up everything of that kind under the first contract. The bonuses under this contract, however, remain, and claim is made on account of them. These, as already stated, were paid up to December 9, 1906, covering the first year of the contract; but they are claimed for the intermediate period to April 12, 1907, four months and three days, which, at the minimum rate for the second year, would amount to $67. Dr. Voorhees was, of course, entitled to the stipulated percentage on actual sales of sheet metal and metal parts, made in this interval, but what these were is not shown. And without regard to it, the claim is figured on the minimum rate for the proportionate part of the year, so far as it had gone. This item has been disallowed by the referee, on the ground that the provision for a min-

imum applied to the year as a whole, and had only to be made good at the end of it, to the extent that there was then found to be a deficiency. There can be no question as to the correctness of this view under the circumstances. The case is not like Consolidated Coal Company v. Peers, 150 Ill. 344, 37 N. E. 937, where the guaranteed yearly minimum was made payable in equal monthly installments proportionate to the whole amount; and the distinction made in that case goes to prove the rule. The only undertaking on the pa t of the bankrupt company was to pay a minimum amount, year by year, and this took in the whole year, and was not distributed around over it. If there was a brisk trade in one part of the year, the company had the right to rely on this to help out another part of the year, when trade was slack. It was only the quantity which was lacking, when the entire year had run around, that had to be made up. But this would be prevented, if the minimum was apportioned, and was required to be forthcoming, ratably, month by month. Nor is this overcome by the provision that monthly statements were to be rendered and monthly settlements made. All that is so provided for is the monthly business done. It did not have the effect of dividing up the minimum. The year being broken into, therefore, by the making of the new agreement, the claimant must take things as they stood at the time, and as they were left by it. If he had rights which he wanted to save, he should have provided for it in the new agreement.

[2] This brings us to the second contract, under which two claims are made. The first is for salary as president from April 12, 1907, on. There can be no question as to the right to this up to January 15, 1908, when bankruptcy intervened. And this, at the rate of $720, amounts to $546, which the referee has allowed. The rest of the claim for salary, however, he has correctly refused. With the institution of bankruptcy proceedings, the assets of the company became devoted to the payment of its debts, which themselves ended at that time, and could not go on increasingly to come in later. This is not to say that the claimant might not be entitled to damages for breach of the agreement, including the salary which he was to be paid, which enters along with the rest into the consideration for the license to use the patent. But the question of damages is not now involved, although it will be taken up later. The claimant was not entitled to salary as such after his duties as president ceased, which is all that we are concerned with at present.

[3] The other claim, under the second contract, is for bonuses on sheet metal, which, as we have seen, were to be calculated on a minimum of 10,000 feet the first year, and 10,000 feet additional each year thereafter for the life of the patent. There are two heads to this claim: First, the proportionate part of the minimum from April 12, 1907, the date of the contract, to January 15, 1908, when the proceedings in bankruptcy were instituted; and second, for the full minimum after that. The first year of the contract had not been completed at the time of bankruptcy, and the right to anything beyond that event was thereby necessarily interrupted. The claimant had the right, as observed above, with regard to the first contract, to the stipulated per-

centage on the metal work actually sold in the intermediate period, but how much it was has not been shown, and so nothing can be allowed on account of it. But claim is also made, the same as under the other contract, for a proportionate part of the guaranteed minimum, as to which the situation is somewhat different. The first contract was terminated, by mutual consent, by the adoption of a new one, without saving anything under it, and the minimum was therefore left just as it stood without any provision with regard to it. The parties simply dropped the old arrangement for the new one, and no arrangement having been made for an apportionment of the minimum, and the company having otherwise the whole year before becoming liable, there was no basis for liability for a proportionate part of it. But the second contract was brought to an end by bankruptcy before the year was out, and the company, in the meantime, had had the benefit of it for nine months. And it being worth $100 a year to the company to practice the invention, according to the figures stipulated for, and bankruptcy having brought the arrangement to an end, it must be taken to have been worth proportionately as much for the time that it was enjoyed short of that. It is like rent reserved on a lease for a year, which is sometimes apportioned under such circumstances. Morgan v. Moody, 6 Watts. & S. (Pa.) 333, 335.

[4] But the claim for anything beyond the date of bankruptcy stands on an entirely different footing. The claimant asks for the allowance of the minimum bonus year by year for the life of the patent. He does not even take into account that, if the arrangement went on, he would have to wait for the greater part of it a number of years, with all the consequent contingencies. He asks to be allowed a sum in hand equal to the aggregate minimum until 1922. It is difficult to see on what reasonable theory he hopes to get this. The license was personal to the bankrupt, and there was no provision for passing it on to others. It is not, in this respect, like a lease or other continuing contract, as to which this may be done, and which, if valuable, may be sold, and the benefit obtained of it. Here bankruptcy put an end, not indeed to the obligation, but to further liability under it beyond the damages due to the breach which necessarily resulted. To these damages, such as they are, the claimant is entitled. But they are not made up of future annual bonuses, calculated to the end of the agreement. The license granted by the claimant to the bankrupt having fallen in, he is at liberty to repossess himself of it and again dispose of it. And if he could now get the bonuses stipulated for, so long as the patent has to run, in a lump, he would get paid twice over for the same thing, without having contributed anything reciprocally. Accepting bankruptcy as an enforced breach of the agreement, entitling the claimant to damages (In re Swift, 7 Am. Bankr. Rep. 374, 112 Fed. 315, 50 C. C. A. 264; In re Neff, 19 Am. Bankr. Rep. 23, 157 Fed. 57, 84 C. C. A. 561, 28 L. R. A. [N. S.] 349), the only question is what should be allowed on account of it. It is to be assumed that such a license as this is of value, present as well as prospective, and that the claimant could make substantially as good an arrangement with others as he did in this instance. If this is not the case, it is for him to show it. No doubt it

would take time to organize a new company and build up a business, but if the device has merit, the preceding effort is not likely to be wholly lost. The claimant can ask to be compensated for the intermediate delay. But that is all. At the time of bankruptcy the existing arrangement was some two years old; and it would probably take a like period to get into the same shape as the business was at that time; in addition to which it might require something more to get new persons interested and make a start. There has therefore, in all likelihood, been some two or three years lost; after which, it is fair to assume, with proper effort, the claimant would be in as good a position as he was before. It is true that three years have now in fact elapsed, without this having been realized. But it does not appear what effort has been made, and the claimant was not entitled to lie by and do nothing, as he seems to have done, on the mistaken theory that he was to get full compensation in these proceedings. It is necessarily, more or less, a matter of speculation as to the damages which the claimant has sustained, by reason of the breaking up, by bankruptcy, of the existing arrangement. But having regard to the increasing annual bonuses stipulated for, and the time that must be expected to elapse before an equally good arrangement could be perfected, $1,000 does not seem to be out of the way, and this will be accordingly allowed him. He is not debarred of this, because he was one of the petitioning creditors. Bankruptcy was imminent, and there are no doubt others who would have taken advantage of it if he had not, nor was he alone responsible for the proceedings, the other petitioning creditors being necessary parties. This amount, it is to be noted, is exclusive of anything which may hereafter be awarded for the use of the invention by the receiver or the trustee, under the license, which of course must be paid for, but as to which there are other considerations. The claim against the estate on this latter account is also an administrative charge, and does not therefore come up for allowance at this time. It is in the interest of the claimant, indeed, that it should not, as he will be entitled to payment in full for anything that is due on that score, instead of only getting a fraction of it. It forms no part, however, of the present claim, and the referee was therefore right in disallowing it.

[5] The other matters were correctly disposed of except one, and require no extended consideration. The claimant, being president of the company, had no right to a commission on sales either of stock or material, except as there was a distinct agreement to that effect, which has not been shown. Althouse v. Cobaugh Colliery Co., 227 Pa. 580, 76 Atl. 316. It affords no basis for such a claim that they were allowed to others. Nor is it of any consequence that $138 was actually paid him by the company on this account. Just how this came about does not appear. The directors may have felt that he ought to be remunerated to that extent for his services in this connection without thereby establishing his rights as a legal claim to the remaining $62 contended for.

[6] As to the so-called protection notes of $2,000 and $5,000, respectively, which were given by the company to secure Dr. Voorhees and others against liability on their guarantee and indorsements of the

company's obligations, it is sufficient to say that these obligations do not appear to have been taken care of by Dr. Voorhees, and only to the extent that they have been, has he any standing to make claim in his own name with regard to them. Philips v. Dreher Shoe Co. (D. C.) 7 Am. Bankr. Rep. 326, 112 Fed. 404.

[7] The claim for maintaining an office for the company at Scranton, some 18 months at $5 a month, was also correctly disposed of. It may be that by its charter the company was required to keep an office at that place, and for a time it no doubt did so, using a part of Dr. Voorhees' office for the purpose. But the continuance of this arrangement was a matter for the directors and not for Dr. Voorhees by himself, either as president or general manager. He could not insist on his own office serving this purpose, and much less, if he considered it necessary that the company should have such an office in that city, and chose to furnish it, could he make a charge for it. If he gave a space in his office, in order to comply with the charter, and save any question, so far as compensation is concerned, it must be regarded as voluntary.

The claimant is entitled, however, to the $10 which he paid out in change, in collecting the bill of Dr. Lindabury. Dr. Lindabury owed the company $10 and paid it to Dr. Voorhees with a $20 check, which he happened to have with him, getting back $10 by way of change from Dr. Voorhees. This $20 check was then turned over to the treasurer of the company, and a check drawn to the order of Dr. Voorhees for the $10 that was due him. By mistake however this check was charged up to Dr. Voorhees on the books of the company, and was paid back by him without noticing it, when he came to settle his account. It is clear that the company owes him this $10, and it should therefore be allowed him.

This disposes of the several items of the claim as proved. The referee has carefully reviewed the case, and made an excellent and exhaustive report. I do not agree with him in everything that he has said, but I do in the most of it.

The aggregate amount allowed by the referee is.................... $ 625 58
This should be increased by nine months' bonus from
    April 12, 1907, to January, 1908....................... $    75 00
Damages for breach of the license agreement............  1,000 00
Paid out in change to Dr. Lindabury....................      10 00
                                                       ————————  1,085 00
                                                                 ————————
    Total claim as allowed.................................... $1,710 58